In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-20-00166-CV
_____

I-10 R.V., L.L.C., Appellant

V.

JEFFERSON COUNTY APPRAISAL DISTRICT, Appellee

---

**On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. B-200,701**

---

## MEMORANDUM OPINION

I-10 R.V., L.L.C. (Appellant or I-10 R.V.) sought review in the trial court of a final order of the Jefferson County Appraisal District (Appellee or JCAD) ordering that the appraisal records for Gulf Coast RV Park (the RV Park) reflect a total assessed value of $1,288,680 for tax year 2017. The trial court rendered judgment for JCAD and ordered that (1) I-10 R.V. take nothing in the suit and pay JCAD's court costs, (2) the RV Park was not entitled to exemption from ad valorem taxes under the Texas Property Tax Code, and (3) the market value of the RV Park was

1

$1,288,680 for tax year 2017. On appeal, Appellant argues that the trial court erred in concluding that I-10 R.V. had a leasehold or possessory interest and not a management interest, and that the trial court erred in finding that the RV Park was not being used for a public purpose.[1] We affirm the trial court's judgment.

Background

I-10 R.V. filed an Original Petition for Review of Appraisal Review Board Order, complaining that JCAD had improperly valued the interest of I-10 R.V. in the property and sought relief under section 42.25 of the Tax Code. I-10 R.V. asked the trial court to determine the appraised value for 2017 and argued the value should have been zero because the property is exempt. According to the Petition,[2] I-10 R.V. was notified that the valuation of the RV Park for 2017 would be "a Structured/Improvement Market Value of $927,810.00, plus a proposed Market Value of Non-Ag Timber Land of $360,870.00, for a total assessment of $1,288,680.00[,]" and that I-10 R.V. would be assessed with the taxes. I-10 R.V. filed a Notice of Protest for tax year 2017. At a hearing before the Appraisal Review

---

[1] On appeal, I-10 R.V.'s only challenge to the assessed value is that it should be $0 on the bases that the property is exempt and that I-10 R.V. does not have a leasehold or possessory interest in the property. I-10 R.V. does not argue in the alternative that if the property is not exempt or if I-10 R.V. has a leasehold or possessory interest in the property that the assessed value of $1,288,680 is incorrect.

[2] We refer to the Plaintiff's Third Amended Petition for Review of Appraisal Review Board Order, the live petition at the time of the trial court's judgment, as the "Petition."

Board, I-10 R.V. alleged it was not the owner of the property and did not have a possessory interest in the RV Park. I-10 R.V. argued the property was owned by Jefferson County (the County), that it was part of "Ford Park,"[3] and that I-10 R.V. only acted as a "manager" of the RV Park under a written agreement with the County. The Appraisal Review Board disagreed and decided it would not reduce the assessed value. In the Order Determining 2017 Protest or Notice of Final Order dated July 25, 2017 the Appraisal Review Board stated, "the Appraisal Review Board with a quorum present determined your property value and ORDERS that the appraisal records reflect the following: …TOTAL ASSESSED VALUE: $1,288,680.00." According to the Petition, the total estimated tax billed to I-10 R.V. for 2017 was $35,432.33.

Underlying Chronology of Agreement

In 2000, I-10 R.V. executed an agreement with the County titled "RV Park Management Agreement" (the Agreement) in which I-10 R.V. agreed to construct improvements for an RV Park on County land adjacent to what is now known as "Ford Park." In 2002, the County Judge at that time sent a letter confirming that I-10 R.V. had complied with the capital contributions requirements of the Agreement.

---

[3] According to its website, "Ford Park is the premier sports, entertainment, and convention destination in Southeast Texas[,]" and includes an entertainment pavilion, exhibit hall, arena, midway, and youth baseball/softball fields. Ford Park, https://www.fordpark.com/about/about-ford-park-spectra (last visited March 23, 2022).

3

In 2015, the County adopted the First Amendment to RV Park Management Agreement (the amendment to the Agreement). The parties agree that I-10 R.V. was not assessed any property tax on the RV Park prior to 2017.

Requested Relief in Trial Court

I-10 R.V. sought a declaration that the interest held by I-10 R.V. in the RV Park is tax exempt, and further that the assessed value of their interest in the property is zero. I-10 R.V. reasoned that under Texas Property Code Section 11.11 property owned by the County is generally exempt from taxation if the property is used for a public purpose. *See* Tex. Tax Code Ann. § 11.11(a). Additionally, I-10 R.V. alleged that the provisions of section 25.07(a) of the Tax Code did not apply because I-10 R.V. does not have a leasehold or possessory interest in the RV Park. *See* Tex. Tax Code Ann. § 25.07(a) (providing that with some exceptions, a leasehold or other possessory interest in real property that is exempt from taxation to the owner of the estate encumbered by the possessory interest shall be listed in the name of the owner of the possessory interest for interests that have a one year or more duration).[4] I-10 R.V. sought a judgment fixing the value of the RV Park as of January 1, 2017 as "$0.00 non-taxable/tax exempt[,]" asking that the tax rolls be corrected, and awarding I-10 R.V. costs and reasonable attorney's fees.

---

[4] I-10 R.V. also asserted that JCAD failed to comply with notice requirements under Texas Property Code Section 11.11(d). I-10 R.V. does not argue this point on appeal.

4

JCAD filed its Answer,[5] asserting a general denial and special exceptions. JCAD asked the trial court, upon trial, to determine the value of the RV Park, that this value be entered on the appraisal rolls for 2017, that I-10 R.V. recover nothing, and that JCAD be discharged with costs.

After a bench trial, the trial court signed a final judgment ordering that I-10 R.V. take nothing, awarding costs to JCAD, finding that the RV Park "is not entitled to exemption from ad valorem [taxes] under the Texas Property Tax Code[,]" and determining the market value for the RV Park for 2017 as $1,288,680. I-10 R.V. filed Plaintiff's Request for Findings of Fact and Conclusions of Law and later Plaintiff's Notice of Past Due Findings of Fact and Conclusions of Law Pursuant to Rules 296 and 297 of the Texas Rules of Civil Procedure. I-10 R.V. filed a Motion for New Trial, which was overruled by operation of law, and then I-10 R.V. filed its Notice of Appeal.[6]

Evidence at Trial

The Agreement

A copy of the Agreement was admitted into evidence. The Agreement included these provisions:

---

[5] We refer to Defendant's First Amended Original Answer to Plaintiff's First Amended Petition for Review and Request for Disclosure, JCAD's Answer on file at the time of the trial court's judgment, as JCAD's "Answer."

[6] Appellant does not complain on appeal about the failure of the trial court to issue findings of fact and conclusions of law.

# RV PARK MANAGEMENT AGREEMENT

. . . .

## BACKGROUND

The COUNTY is currently in the process of developing and constructing a new public assembly facility called the Southeast Texas Entertainment Complex (the "Entertainment Complex"), which will be located in Jefferson County, Texas.

Approximately 15 acres in the southeast corner of the 221-acre entertainment complex site has been set aside for the construction of an RV Park. The RV Park will feature a distinctive entrance and prominent identification signage for ease of location. The RV Park will contain approximately 150 sites. [] The RV Park will be designated for short-term visitors and tourists rather than residential or seasonal users.

I-10 R.V. is engaged in the business of, among other things, providing management services for the hospitality industry and the RV Park business.

The COUNTY desires to engage I-10 R.V., and I-10 R.V. desires to accept such engagement, to provide management services for the RV Park to be built in conjunction with the Entertainment Complex on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises, covenants, and agreements herein contained, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Scope of Services[.]
        (a)     During the Term (as defined in Section 4 below), I-10 R.V. will provide to the COUNTY the following:
                (i)     I-10 R.V. will participate in the design, construction and management of the RV Park in order to plan and initiate construction of the described facilities by mid-year 2000.
                (ii)    I-10 R.V. will fund and supervise construction of all buildings and structures supporting and serving the operation of the R.V. Park. [] All permanent improvements will become the property of the COUNTY upon completion.
                (iii)   I-10 R.V. will be responsible for proper operation, maintenance and upkeep, daily supervision, necessary

6

permits and licenses, insurance, financial reporting and setting rates for the RV Park.

(iv)   I-10 R.V. will initially contribute not less than $400,000 to the RV Park project. The capital investment will be used by I-10 R.V. to construct improvements to the RV Park which I-10 R.V. determines, in its opinion, will enhance the RV Park. [] Any and all capital improvements made by I-10 R.V. to the RV Park will become the property of the COUNTY.

(b)   The COUNTY will provide approximately 15 acres in the southeast corner of the Entertainment Complex site for construction of the RV Park. The County will also provide infrastructure required for the RV Park, including streets, sidewalks, drives…, water and sanitary sewer extensions …water, sewer, electrical….

. . . .

2.   Fees, Expenses, and Insurance.

(a)   Percentage Fees.

(i)   For each fiscal year, during the term of this Agreement, the COUNTY will receive a percentage of gross rental revenue by I-10 R.V. in conjunction with the operation of the RV Park. The COUNTY will also receive a percentage of gross sales revenue from the convenience store, game room and vending machine sales. As a fee, I-10 R.V. will pay COUNTY ten percent (10%) of gross rental revenue of amounts between $0.00 and $500,000.00, and twenty percent (20%) of all gross rental revenue over $500,000.00. In addition to the percentage fee applied to gross revenue, I-10 R.V. will pay COUNTY three percent (3%) of all gross sales revenue from the convenience store, game room and vending machines. []

(b)   Expenses. Upon opening of the RV Park, I-10 R.V. will pay all costs associated with daily cleaning, maintenance, routine service and general cost of operating and maintaining the RV Park. The County will pay for repair of structure failures to the infrastructure installed by the County. []

. . . .

3.   Records and Reports. I-10 R.V. will have the following responsibilities with respect to records and reports:

(a)   I-10 R.V. will establish and maintain a comprehensive system of records, books and accounts.

(b)   With respect to each fiscal year ending during the term of this Agreement, the Agent will have an annual financial report

7

prepared by a Certified Public Accountant based upon the preparer's examination of the books and records of I-10 R.V. The report will be certified by the preparer and I-10 R.V., and will be submitted to the COUNTY within sixty (60) days after the end of the fiscal year.

(c)     I-10 R.V. will furnish such information (including occupancy reports) as may be requested by the COUNTY from time to time with respect to the financial, physical or operational condition of the RV Park.

4.     Term and Termination.

(a)     This Agreement will be effective for a term of ten (10) years, beginning 90 days from COUNTY's commencement of construction of the infrastructure requirement for the RV Park.

(b) The County hereby gives and grants to I-10 R.V. the right and option to extend the term of this Agreement for two (2) 5-year periods[.]

. . . .

5.     Prohibition Against Liens.

(a)     I-10 R.V. shall have no right, authority, or power to bind the COUNTY with respect to the interest of the COUNTY hereunder or as owner of the Improvements on any claim or lien for labor, materials, equipment, or supplies or any other charge or expense incurred[.] I-10 R.V. shall not be considered as the agent of the COUNTY or as the owner of any interest in the improvements with respect to any such construction, installations, maintenance, repairs or replacements[.]

. . . .

7.     Assignment.

(a)     This Agreement may not be assigned by any party except upon express prior consent in writing of the other party, which consent shall not be unreasonably withheld.

(b)     Subject to the provisions set forth in Section 6(a) above, this Agreement and the rights and obligations set forth herein will inure to the benefit of, and be binding upon, the parties hereto, and each of their respective successors and assigns.

. . . .

14. Complete Agreement Headings; No Third Party Beneficiaries. This Agreement sets forth the entire understanding between the parties hereto and supersedes all prior agreements, arrangements, and communications, whether oral or written, with respect to the subject matter hereof. No other agreements,

8

representations, warranties, or other matters, whether oral or written, will be deemed to bind the parties hereto with respect to the subject matter hereof. …

. . . .

The Amendment to the Agreement

A copy of the 2015 amendment to the Agreement was also admitted into evidence. It stated:

FIRST AMENDMENT TO RV PARK MANAGEMENT
AGREEMENT

. . . .

WHEREAS, the COUNTY and I-10 R.V. heretofore entered into one certain RV Park Management Agreement dated June 18, 2000 relating to the construction, maintenance, and operation of an RV Park located at the Southeast Texas Entertainment Complex… (the Original Agreement);

. . . .

WHEREAS, the COUNTY and I-10 R.V. have agreed to certain changes to the Original Agreement, which changes will inure to the benefit of both parties;

NOW, THEREFORE, the RV Park Management Agreement dated June 19, 2000 is hereby amended as follows:
….
2. At the time of this First Amendment becomes effective, the following shall occur: I-10 R.V. will assume responsibility for all maintenance, including repairs or replacement as necessary, of the infrastructure (including utilities) of the RV Park, which responsibility was previously that of the COUNTY under Paragraph 2(b) of the Original Agreement. I-10 R.V., rather than the COUNTY, will have sole discretion over what repairs to the Infrastructure are required. The Percentage Fees payable to the COUNTY under Paragraph 2(a) of the

9

Original Agreement shall remain the same until the end of all option periods under the Original Agreement. At the end of the second 5-year option period granted under Paragraph 4(b) of the Original Agreement, I-10 R.V. shall have the right and option to extend the term of the Original Agreement for one additional 10-year option period, exercisable by I-10 R.V. in the same manner provided in the Original Agreement for exercise of the two 5-year option periods. During the additional 10-year option period, the Percentage Fee payable to the COUNTY under Paragraph 2(a) of the Original Agreement shall be increased to 12.5% of gross rental revenues up to $500,000.00 per fiscal year, and 25% of all gross rental revenues over $500,000.00 per fiscal year; the percentages of gross sale revenues payable to the COUNTY from the convenience store, game room and vending machines remain as stated in the Original Agreement.

. . . .

4. Except as revised hereinabove, the terms of the June 19, 2000 RV Park Management Agreement remain in full force and effect.

. . . .

## Testimony of Donald McGregor

Donald McGregor testified on behalf of I-10 R.V. He stated he had been an investor "all his adult life[,]" and that he was a member and president of I-10 R.V. He testified that I-10 R.V. owned Gulf Coast RV Park and it was "the vehicle through which advice and recommendations [we]re made for the utilization" of the RV Park. It was McGregor's understanding that Jefferson County, who owned the property as part of Ford Park, was looking for someone to build an RV Park on the property and that the property would not be taxed. According to McGregor, McGregor and other investors were approached to see if they were interested in investing in a project on the property. McGregor testified that "the feeling was that Ford Park was going to be a major complex and was going to provide plenty of

10

reasons for people to want to come and we felt that the RV [park] would be a good fit" because it would provide a place for Ford Park visitors to stay overnight and attract people to come and visit Ford Park. McGregor testified that the business deal had limitations because the County had limited the arrangement to a management agreement and not a lease, the investors would have to pay "out of pocket" for the improvements because no bank would lend money for the improvements because there would be no collateral or equity in the project because the investors would have no ownership interest in the park. McGregor testified that despite the limitations of the high-risk deal, the investors decided it could be productive and they agreed to the business deal. The RV Park started doing business in 2001. An aerial photograph of the property was admitted into evidence.

According to McGregor, the Agreement between Jefferson County and I-10 R.V. was not a lease agreement. Under the Agreement, about fifteen acres in the southeast corner of the Southeast Texas Entertainment Complex would be set aside for the construction of an RV park and I-10 R.V. would provide management services. McGregor testified that under the Agreement, I-10 R.V. would fund and supervise construction of all buildings and structures serving the operation of the RV Park but that all permanent improvements would become the property of the County upon completion. McGregor testified that the improvements I-10 R.V. funded and constructed were concrete streets, water, sanitary sewer, storm facilities, storm drain

11

facilities, and two buildings (a principal building for the park and a food facility), and that under the Agreement these improvements were owned by the County. I-10 R.V. spent approximately $800,000 on improvements, and the RV Park had 125 RV spots for rent. Under the Agreement, at the end of each year, I-10 R.V. paid the County a percentage of the RV Park's revenue, and then all expenses came out of I-10 R.V.'s portion. McGregor agreed that the Agreement required I-10 R.V. to keep books and records for the RV Park and provide a report every year to the County, and that the County would review the books and records to make sure that the RV Park was managed correctly for their benefit. According to McGregor, the County at any time could demand books and records from the RV Park. McGregor testified that originally under the Agreement, the County would pay for all maintenance and infrastructure problems, but an amendment to the Agreement in 2015 required I-10 R.V. to make repairs to the improvements. The Agreement was for a set amount of time and at the end of the Agreement if not renewed, the RV Park would have no rights to the improvements. The Agreement also provided that I-10 R.V. would have the exclusive right to have an RV park near Ford Park.

McGregor testified that the RV Park and Ford Park have benefitted from each other over the years, and the RV Park has had overnight visitors related to events at Ford Park's baseball and softball fields. According to McGregor, the initial vision of the RV Park was narrow—that it would add to the success of Ford Park by making

12

it more attractive to visit—and no one anticipated the amount of commercial business that the RV Park would generate, such as RV space rentals for people staying there "on business." McGregor testified that he believed the County thought that the percentage of "leisurely" clientele would be greater. McGregor testified that the RV Park was "absolutely[]" part of Ford Park. He testified that the RV Park promoted on its website that it was located within Ford Park. There was a pedestrian gate to get from the RV Park to Ford Park, but other than that "there's not much interchange between [the] RV [p]ark and the rest of the complex."

McGregor testified that he believed the RV Park supported the comfort and welfare of the public by providing recreational opportunities and overnight accommodations, and that the RV Park served the same public purpose for which the County used it. McGregor testified that one could drive an RV from the RV Park to the softball fields without having to exit the facility if the gate was open and that there were also two pedestrian gates that, if open, would allow one to walk to the softball fields from the RV Park. He testified that in all the renderings he observed during the planning of Ford Park or the Southeast Texas Entertainment Complex, the RV Park was included as a part of Ford Park or the Southeast Texas Entertainment Complex. According to McGregor, the fact that the RV Park was a part of Ford Park or the complex was a big factor in his decision to invest in the RV Park.

McGregor testified that the RV Park did not give discounts to visitors staying at the RV Park who were in town for softball or state fair events at Ford Park. McGregor testified that he did not believe the RV Park had any type of leasehold interest. McGregor did acknowledge that the Agreement spoke about the possibility of there being assignments of his rights and successors in interest to his right in the property. He testified that he assumed that counsel who helped negotiate amendments to the Agreement for I-10 R.V. mistakenly referred to the Agreement at times in documents as a "lease" because he was unsure what to call the arrangement. According to McGregor, the Agreement was not a lease agreement because it was a management agreement, there was no equity, and there was nothing that I-10 R.V. could sell on the open market. McGregor testified that he knew that the RV Park depreciated the improvements on its books, but he did not know why, and that he did not believe that depreciating the improvements made the RV Park the owner of the improvements. He testified that he assumed the accountant listed and depreciated the assets on the I-10 R.V.'s financials because it was appropriate under some provision in the tax law. He admitted that his belief that the RV Park would not be taxed was not based on what someone or the County told him but was based on his "general understanding of government-owned property being exempt from ad valorem taxes." Financial documents for I-10 R.V. were admitted into evidence, and these documents show, among other things, that I-10 R.V. had a total

14

income of $834,789.51 and net income after expenses of $246,281.13 in 2016, and that its tax expense went from $447.48 in 2016 to $35,783.89 in 2017, due to the imposition of ad valorem taxes in this lawsuit. An Income Valuation Worksheet for 2017 for the RV Park prepared by I-10 R.V.'s accountant was admitted into evidence and showed $1,288,680 as the value of the RV Park.

Testimony of Angela Bellard

Angela Bellard, the chief appraiser of the JCAD since 2015, testified she had worked at the appraisal district since 1985. According to Bellard, her "duty was to make sure that all taxable property is placed on the roll at market value, make sure everyone is treated equally, and that everyone pays their fair share of taxes." Bellard testified that around the time she became chief appraiser, the appraisal district implemented a program that monitored exemptions, and she removed exemptions, such as churches' religious property exemptions, if they had not fulfilled the duties spelled out in the exemption. She agreed that removing such exemptions generated revenue for the taxing entities.

Bellard testified that before 2017, the RV Park was not on the Jefferson County tax rolls and she asked Jefferson County for any type of agreement it had with the RV Park so she could determine whether it should be on the tax rolls. She testified that some documents she received from the County included the Agreement, a letter from I-10 R.V.'s counsel to counsel for the County, and the amendment to

15

the Agreement. According to Bellard, when she received the Agreement, her position was it was a lease and not a management agreement, even though nowhere in the Agreement did it call the arrangement a lease nor does it call the parties landlord and tenant. Bellard testified that she believed the Agreement was a lease because of how the percentages were being paid by the RV Park to the County and the RV Park was granted exclusive use to the property for profit which is a possessory interest. Bellard testified that the amendment to the Agreement gave a possessory interest in the land and in the improvements on that land for a period that exceeds one year. According to Bellard, although the original intent might have been that the RV Park was a part of Ford Park, her position was that the intent had changed, and the RV Park was not a part of Ford Park. Bellard testified that if it was a typical management agreement, the County would pay a fee to I-10 R.V. and the County would be listed as the owner of the property and the County would face potential taxation depending on the terms of the agreement. According to Bellard, if the Agreement terminated and the County continued to operate the RV Park, the County would be taxed on the property if it was used for non-public purposes because the tax code did not allow the County to operate an RV park for profit, but potentially the County would not be taxed on the property if all profits were strictly used for county purposes. Bellard testified that, to her knowledge and during her time at the appraisal district, there was never a situation when the County owned

property and had to pay taxes on that property. Bellard agreed that most of the time when the County owned land, it uses it for a public purpose.

Bellard testified that after she received the documents from the County, because of the uniqueness of the situation that would potentially put a property on the tax roll that had not been on the roll for some time, she consulted with the appraisal district's attorney and asked for an opinion letter. Bellard testified that after she received the opinion letter, she met with the County because she reached out to the County "[a]nytime there's a property that has an impact possibly on the [c]ounty[]" to "let them know what's going on."

Bellard agreed that the County owned the land and improvements at the RV Park. She testified it was her position that the approximately 221 acres of land at and around Ford Park, except the fifteen acres on which the RV Park sits, was considered tax exempt because the land was being used for public purposes. Bellard testified that although she was not an attorney, she believed that, for the property to be tax exempt, it would have to be used exclusively for public purposes. She agreed that just because there was a charge to access county property did not mean the property was not being used for a public purpose, and that whether a profit was generated made a difference as to whether the property was being used for a public purpose.

Bellard testified that the appraised market value of the property for tax year 2017 was $1,288,680, which matched the amount shown as the RV Park's value on

17

the Income Calculation Worksheet for 2017 for I-10 R.V. by its CPA. She testified that the adjusted value of the improvements to that property was $1,474,410 and the market value of the land was $360,870, but that the total of those two figures was greater than the appraised market value because the appraisal district appraised the property using the income approach to valuing the property. Bellard testified that Hidden Lake RV Resort, Gulf Coast RV Park's closest competitor, was also valued on that basis. Bellard testified that because of Property Tax Code section 25.07, 100% of the property was listed in the name I-10 R.V., and it was not listed in the name of Jefferson County because I-10 R.V. had a leasehold or other possessory interest in the property that exceeded one year. Bellard testified that because the property is exempt to the owner of the estate, Jefferson County, she valued the leasehold or possessory interest based off its income. According to Bellard, she did not have actual income data for 2017 for the RV Park until discovery in the case, and although a document received through discovery showed a higher net income than her schedule attributed to it, JCAD was not asking the trial court to raise the market value for 2017. Bellard also testified that, although the Property Tax Code allowed JCAD to go back five years and collect for property that should have been on the tax rolls but was not, here JCAD did not do so because "[t]here was no reason to punish them for the past five years."

Bellard testified that the RV Park protested the determination, lost the protest hearing, and then filed this suit. Bellard agreed she had communicated with county officials about the process during the protest. She agreed that she emailed Judge Jeff Branick on Tuesday, July 11, 2017, stating, "Hearing went well, no change on ownership or value!" but she denied that she was excited to tell the judge that I-10 R.V. had to now pay taxes. The email was admitted into evidence. According to Bellard, the RV Park did not in its protest hearing or at any time challenge the value she placed on the property, and in fact, she had evidence from the RV Park that the valuation was probably too low. Bellard testified that it was her understanding that although JCAD pleaded a market value in its answer in this suit, the issue before the trial court in the suit was the market value of the property and the court could, based on the evidence, raise the market value.

Testimony of County Judge Jeff Branick

Jeff Branick, the County Judge for Jefferson County since 2011, testified that his duties as county judge included negotiating contracts on behalf of the County. According to Branick, Jefferson County owned the land on which the RV Park was located. Branick was not the county judge when the original Agreement was executed, and he was not involved in the drafting or execution of the original Agreement.

Branick testified that he served on a committee in 2006 or 2007 wherein he reviewed the operations of Ford Park and that he did not consider the RV Park Agreement to be a management agreement because he would not pay a manager "90 percent of the revenues" from the operation of the facility. According to Branick, in late 2014 he was approached at a meeting by one of the I-10 R.V. investors who stated the investors in the RV Park wanted an option period on the Agreement because of their advanced ages so that they could pass the Agreement down to their children. Branick testified that he told the investor that he did not object to extending the terms or giving them another option period "so long as the [C]ounty was completely out of it[]" because the County "just wanted to be landlords[]" and not have to respond to maintenance calls for the RV Park. The parties agreed to an amendment, but it took about a year to "etch[] in stone[]" the terms of the amendment. According to Branick, under the amendment to the Agreement, the County no longer had any responsibility for the maintenance or the operation of the RV Park.

Branick testified that he was the County's contractual liaison with Ford Park's management company, that the RV Park in no way contributed to the public purposes of the operation of Ford Park, the RV Park played no part in the operation of Ford Park or the softball or baseball diamonds, and the operations, duties, and employees of the RV Park did not overlap with those of Ford Park. Judge Branick

testified that under the Agreement with I-10 R.V., I-10 R.V. had a possessory interest in the land or improvements. Branick testified that the Agreement with I-10 R.V. was very different than other management agreements such as the County's agreement with Spectra Management at Ford Park. Under the Agreement, the RV Park had no obligation to provide spaces to Ford Park for the fair, softball tournaments, or any other events. It was Judge Branick's understanding that most of the RV Park's spaces were occupied by people doing construction in the area and not tourists or participants in Ford Park events. Branick testified that the RV Park played no part in the operation of Ford Park and in no way contributed to the public purposes of the operation of Ford Park, even though the original vision for the RV Park may have been to promote Ford Park as expressed in the Agreement. Branick also testified that he had reviewed the emails admitted at trial in which counsel for I-10 R.V. characterized the Agreement as a lease and called his clients "tenants," and Branick also characterized the relationship between the County and I-10 R.V. as a landlord and tenant relationship because the County received one payment a year and was not involved in the operation or maintenance of the RV Park. Branick further testified that when the amendment or extension of the Agreement was posted in the commissioner's court agenda, it was listed as an "extension of a lease." He stated he did not believe the RV Park was being operated for a "public purpose" as explained in section 11.11 of the Texas Property Tax Code, and that the operation

21

of the RV Park had never enhanced the operation of Ford Park. That said, Branick agreed that the more money the RV Park made the more money the County would be paid, and that the County did not have any expenses for the RV Park. According to Branick, if the Agreement with I-10 R.V. expired, the County would get the property and improvements back and would then determine whether the County could manage the RV Park in some way for a public purpose.

Testimony of Everette "Bo" Alfred

Everette "Bo" Alfred testified he had been county commissioner of Precinct No. 4 in Jefferson County for eighteen years and that Ford Park was inside his precinct. Commissioner Alfred testified that he was not a commissioner when Gulf Coast RV Park was built, and he had no role in the execution of the Agreement. According to Commissioner Alfred, the RV Park was not within Ford Park or part of Ford Park. Commissioner Alfred agreed that the County owned the land and the improvements of the RV Park, and a wooden fence separated the RV Park and Ford Park. Commissioner Alfred testified that, to his knowledge, the RV Park did not provide any service to Ford Park or the softball and baseball fields or provide spaces for Ford Park to support the Southeast Texas State Fair or the fields. According to Commissioner Alfred, the RV Park provided nothing to the public. Commissioner Alfred agreed that the original Agreement stated that approximately fifteen acres of the 221-acre Southeast Texas Entertainment Complex would be set aside for an RV

22

Park that would be constructed with the entertainment complex. Commissioner Alfred testified that at one point, he was asked by I-10 R.V. to make road repairs and that request led Alfred to ask the District Attorney about the appropriateness of county employees working on private roads. Commissioner Alfred stated, "that's when everything stopped[,] and a new agreement came about." Commissioner Alfred recalled that around 2015 the original Agreement was amended to change the percentages of revenue and obligated I-10 R.V., and not the County, to make repairs. Even so, Alfred agreed that the RV Park brought a percentage of revenue to the County with no expenses to the County, and that when the property goes back to the County, the County would benefit from the improvements.

Testimony of Patrick Swain

Patrick Swain, county auditor for Jefferson County for twenty-three years and licensed certified public accountant, testified that he reviewed the I-10 R.V.'s financial documents including a document listing its fixed assets. According to Swain, it appeared from that document that the assets were being represented as assets of I-10 R.V. He testified that another document showed "the details of the assets that were purchased and placed onto the property" and the method of depreciation and how many years of they would be depreciated. He testified he had never had a complaint or suspicion about the money paid to the County by the RV Park.

## Issues on Appeal

In issue one, Appellant argues that the trial court erred when it found that I-10 R.V. had a leasehold or possessory interest, rather than a management interest. In issue two, Appellant argues the trial court erred in finding that the RV Park is not being used for a public purpose. I-10 R.V. argues it is open to the public, it financially benefits Jefferson County, and is being used the same way the County would use the property and therefore it serves a public purpose. We construe Appellant's issues as challenges to the legal sufficiency of the evidence.

## Standard of Review and Applicable Law

After a bench trial, if the court does not sign separate findings of fact and conclusions of law to support its judgment, all facts necessary to support the judgment are implied. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987). The judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984). When the appellate record includes the reporter's and clerk's records, implied findings are not conclusive and may be challenged based on legal and factual sufficiency. *BMC Software Belg., N.V.*, 83 S.W.3d at 795. We review the trial court's decision for legal sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

We review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827.

We review a trial court's conclusions of law as a legal question. *BMC Software Belg., N.V.*, 83 S.W.3d at 794. The appellant may not challenge the trial court's legal conclusions based on factual insufficiency, but the appellate court can examine the trial court's legal conclusion drawn from the facts in the record to determine whether the trial court made the correct legal conclusion. *Id.* When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party had the burden of proof, it must show that the evidence establishes as a matter of law all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

This Court is not a factfinder. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). Instead, the trier of fact—here the trial court—is the sole judge of witness credibility and the weight afforded the testimony. *See GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Generally, statutes creating tax exemptions are to be construed strictly against the taxpayer and in favor of the taxing authority. *See First Baptist Church v. Bexar Cty. Appraisal Review Bd.*, 833 S.W.2d 108, 117 (Tex. 1992); *Tex. Utils. Elec. Co. v. Sharp*, 962 S.W.2d 723, 726 (Tex. App.—Austin 1998, pet. denied). The reasons for this are two-fold. Exemptions are matters of legislative "grace." *See Comm'r of Internal Revenue v. Sullivan*, 356 U.S. 27, 28 (1958). A narrow construction of tax exemptions promotes uniformity and equality by spreading the burden of taxation. *Texas Utils. Elec. Co.*, 962 S.W.2d at 726. "'[A]n exemption cannot be raised by implication[] but must affirmatively appear.'" *Odyssey 2020 Acad., Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 540 (Tex. 2021) (quoting *Tex. Student Housing Auth. v. Brazos Cty. Appraisal Dist.*, 460 S.W.3d 137, 141 (Tex. 2015)). "The taxpayer has the burden to 'clearly show' than an exemption applies, and all doubts are resolved against the granting of an exemption." *Id.* (citing *Tex. Student Housing Auth.*, 460 S.W.3d 137 at 141).

The Texas Constitution provides that all real property is subject to taxation unless exempt. Tex. Const. art. VIII, § 1(b). Article VIII, section 2, provides that "the legislature may, by general laws, exempt from taxation public property used for public purposes[.]" *Id.* art. VIII, § 2(a). In addition, article XI, section 9, states that "[t]he property of counties, cities and towns, owned and held only for public

purposes… and all other property devoted exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation[.]" *Id.* art. XI, § 9.

Exercising its authority under article VIII, the legislature has enacted section 11.11(a) of the Tax Code, which states "property owned by this state or a political subdivision of this state is exempt from taxation if the property is used for public purposes." Tex. Tax Code Ann. § 11.11(a). Although state-owned property is generally exempt from taxation, it must be used for public purposes to maintain that exemption. *See id.* 11.11(d) ("Property owned by the state that is not used for public purposes is taxable."). Whether property is used for public purposes is a highly fact-specific question that must be answered on a case-by-case basis. *Tarrant Appraisal Dist. v. Tarrant Reg'l Water Dist.*, 547 S.W.3d 917, 928 (Tex. App.—Fort Worth 2018, no pet.). "In determining whether [] public property is used for a public purpose[,] the test appears to be whether it is used primarily for the health, comfort, and welfare of the public." *A. & M. Consol. Indep. Sch. Dist. v. Bryan*, 184 S.W.2d 914, 915 (Tex. 1945).

Generally, tax liability rests with the owner of property encumbered by a leasehold or other interest. Tex. Tax Code Ann. § 25.06(a). When non-exempt property is leased, the lessor, not the lessee, is responsible for the taxes that accrue on the full value of the property. *Cherokee Water Co. v. Gregg Cty. Appraisal Dist.*, 801 S.W.2d 872, 875 (Tex. 1990). The lessor's interest in the property includes the

present right to receive income from the property as well as the right to receive the property back upon termination of the lease. *Id.* The value of the entire fee necessarily contains the lesser value of the leasehold the fee contains. *Dallas Cent. Appraisal Dist. v. Jagee Corp.*, 812 S.W.2d 49, 53 (Tex. App.—Dallas 1991, writ denied). Unless the leasehold involves exempt property, the leasehold is not independently taxed, but it is subsumed within the value of the fee simple estate. *Id.* at 52.

On the other hand, if one leases exempt property, section 23.13 of the Tax Code provides:

> A taxable leasehold or other possessory interest in real property that is exempt from taxation to the owner of the estate or interest encumbered by the possessory interest is appraised at the market value of the leasehold or other possessory interest.

Tex. Tax Code Ann. § 23.13. Except as provided by Subsection (b) of 25.07, "a leasehold or other possessory interest in real property that is exempt from taxation to the owner of the estate or interest encumbered by the possessory interest shall be listed in the name of the owner of the possessory interest if the duration of the interest may be at least one year." *Id.* § 25.07(a). So, under section 25.07, if the encumbered estate is exempt from taxation to the fee owner, the one year or more leasehold interest is valued and taxed separately from the fee, and the lessee or owner of the possessory interest may be taxed on the leasehold interest in the otherwise exempt property. *Cty. of Dallas Tax Collector v. Roman Catholic Diocese of Dallas*, 41

28

S.W.3d 739, 744 (Tex. App.—Dallas 2001, no pet.) (citing *Cherokee Water*, 801 S.W.2d at 875).

Used for a Public Purpose

Because section 25.07 only becomes operative if the property is tax-exempt under section 11.11, we first address I-10 R.V.'s second issue. *See Gables Realty, Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 874 (Tex. App.—Austin 2002, pet. denied) (court of appeals required to "determine whether Gables Realty's state-leased property [was] exempt under section 11.11 so that section 25.07 bec[ame] operative[]"). In its second issue, I-10 R.V. argues the trial court erred in finding that the RV Park is not being used for a public purpose. I-10 R.V. argues the RV Park is open to the public, financially benefits Jefferson County, and is being used the same way the County would use the property. According to I-10 R.V., the RV Park is a part of the Southeast Texas Entertainment Complex (also called Ford Park) and was specifically designed by the County to be an RV Park used by the public to promote Ford Park. I-10 R.V. points to specific provisions in the Agreement that describe the RV Park as being part of the Southeast Texas Entertainment Complex. I-10 R.V. argues that the Agreement references how the "public" may use the RV Park, and that the amendment to the Agreement did not modify those provisions. I-10 R.V. also argues that the money generated from the RV Park by the County through the Agreement is "money for public use[]" by the

29

County and that the fact that the improvements belong to the County when the Agreement expires is a benefit to the public because the County did not have to pay for the improvements.

I-10 R.V. contends that their public purpose argument gains further support from the testimony in the record, more specifically—McGregor's testimony that gates allowed the RV Park guests to get to the softball fields, Bellard's testimony that the land would be tax-exempt if the County owned it, Branick's testimony that the RV Park was part of the promotion of Ford Park and that the Agreement reflected as such, Branick's testimony that the land where Ford Park and the softball and baseball fields sit is used for public purposes, Branick's testimony that the more money the RV Park makes the more the County benefits with no expenses, Branick's testimony that it was possible that people visiting Ford Park stayed at the RV Park, Alfred's testimony that he could not dispute that visitors to Ford Park or the softball fields stayed at the RV Park, and Alfred's testimony that the Agreement states that the RV Park was created to go along with the Southeast Texas Entertainment Complex and that the County receives monetary benefits from revenues and will benefit from the improvements when the Agreement ends.

I-10 R.V. relies on certain cases in support of its public purpose argument including *Lower Colorado River Authority v. Burnet Central Appraisal District*, 497 S.W.3d 117 (Tex. App.—Austin 2016, pet. denied) and *Tarrant Appraisal District*

*v. Tarrant Regional Water District*, 547 S.W.3d 917 (Tex. App.—Fort Worth 2018, no pet.).

In *Lower Colorado River Authority*, the Lower Colorado River Authority (LCRA) sought review in the trial court of a final order of the Burnet Central Appraisal District determining that LCRA's Sunset Point RV Park was not exempt from ad valorem taxes. 497 S.W.3d at 118. The trial court granted BCAD's motion for summary judgment and the Third Court of Appeals reversed the trial court's summary judgment and remanded the case to the trial court for further proceedings. *See id.* at 119, 121.

In the *Lower Colorado River Authority* opinion, the LCRA was described as a governmental entity whose purposes included the development of parks on lands it owned or acquired. *See id.* at 118. A state statute allowed LCRA to "manage parks, recreational facilities, and natural science laboratories and [] promote the preservation of fish and wildlife within the boundaries of the authority[,]" and authorized LCRA to negotiate contracts with any firm or corporation "for the operation and maintenance" of its parks and recreational facilities. *See id.* at 118, 120 (citing Tex. Spec. Dist. Code Ann. §§ 8503.001, 8503.004(s)). LCRA had not paid property taxes on Sunset Point RV Park, claiming it was exempt from taxation because it was used for public purposes. *Id.* at 119. In 2014, however, the Appraisal District determined for the first time that Sunset Point RV Park was not exempt, and

LCRA filed a protest. *See id.* LCRA was statutorily authorized to negotiate contracts with any firm or corporation for the operation and maintenance of its parks and recreational facilities, and LCRA operated Sunset Point RV Park through a lease with a private for-profit limited partnership. *Id.* at 119-20. The parties did not dispute that Sunset Point RV Park served the public purpose of providing recreational opportunities to visitors. The Third Court of Appeals found that the fact that LCRA leased Sunset Point RV Park to a private for-profit entity to be operated as a public facility and park did not cause LCRA to forfeit the park's tax exemption. *See id.* at 119. In so finding, the Court explained that the lease, which specifically limited the use of the property to "the development and operation of a public commercial recreation facility and public park[,]" established that the purpose of the Sunset Point RV Park remained the same regardless of the entity managing the property. *See id.* at 120. The Court also noted that the lessee was undisputedly operating Sunset Point RV Park for the same underlying purposes as LCRA would if LCRA were operating the park itself. *See id.* at 121.

In *Tarrant Appraisal District*, Tarrant Regional Water District (TRWD) owned property along the Trinity River and leased part of it to a business entity that operated a restaurant. 547 S.W.3d at 919. TRWD received notice that Tarrant Appraisal District (TAD) had proposed to deny TRWD an exemption from paying ad valorem taxes on the property. *Id.* at 922. TRWD protested the decision before

the Tarrant Appraisal Review Board and the review board denied the exemption on the portion of the property that included the restaurant building and surrounding areas and exempted the portion of the property that included "a grassy playground, bike racks, water fountain, park bench, public toilet, trailside shelter, and associated sidewalks and on-street parking[]" for several tax years. *Id.* TRWD appealed the review board's decisions by filing a petition in the district court, and TRWD filed a motion for summary judgment arguing that the property was tax exempt as a matter of law. *Id.* Attached as summary judgment evidence was an affidavit stating that TRWD entered into the lease with the lessee "to encourage development of river-facing businesses on TRWD's property and adjoining properties[,]" and that the property "'was intended and designed as a trail amenity to provide the public with recreational enhancements ancillary to the public's use of the Trinity Trails system.'" *Id.* at 929. The court granted TRWD summary judgment and ordered that TRWD did not have to pay taxes on the property for the years in question and that the property was tax exempt. *See id.* at 922. TAD appealed. *Id.*

On appeal, TAD conceded that the property was used for public purposes before TRWD signed the lease with the lessee. *See id.* at 928. The question before the Second Court of Appeals was whether the property continued to be used for public purposes after the lease was executed and the lessee began operating a restaurant for profit. *See id.* On TAD's motion for rehearing, the Court affirmed the

33

trial court's decision and found that the trial court did not err by granting summary judgment because, as a matter of law, the property was "used for public purposes[]" as provided for in section 11.11(a) of the Texas Tax Code. *See id.* at 929, 931. The Court noted that the summary judgment evidence established that TRWD leased the property to the lessee in connection with the plant to develop the property for economic and recreational purposes, the property was used mainly for the comfort and welfare of the public, and the income that TRWD received from the lease was deposited in TRWD's general fund for use for public purposes. *Id.* at 929. The Court also relied on TRWD's Organic Statute and the language of the lease. *Id*. The Court explained that TRWD's Organic Statute authorized TRWD to have recreational facilities and facilities intended to promote economic development and that the accomplishments of those purposes were for the benefit of the State, and the language of the lease confirmed that the property was used for public purposes. *See id.* The Court noted that any incidental private benefit that the lessee earned from its operation of the restaurant did not eliminate the public purposes for which the property was used. *Id.*

We find these cases are distinguishable from our case. The two governmental entities in the foregoing cases, LCRA and TRWD, each had statutory authority that the County does not hold and the leases or agreements at issue in those cases contained language that does not exist in the Agreement or amendment to the

34

Agreement at issue in our case. In both the LCRA and TRWD agreements there was language expressly confirming the use to be for economic and recreational development, benefiting the public.

In contrast, we find the discussion used by the court in *Gables Realty* to be instructive. In *Gables Realty*, the Austin Court of Appeals looked to the use of the property by the lessee in determining whether the property was exempt under section 11.11 and whether Gables had a right to rely on that exemption in section 25.07. *See Gables Realty*, 81 S.W.3d 872-875. The Austin Court of Appeals held that "whether state property is exempt in the hands of its owner under section 25.07 must be determined by applying section 11.11, taking full account of the lessee's use of the property." *Id.* at 875. Because Gables Realty used the leased property for a private commercial use, the property was not exempt from taxation, thereby precluding application of section 25.07. *See id.* at 875-76.

I-10 R.V. had the burden to show that the evidence established as a matter of law all vital facts supporting that the RV Park was used for a public purpose. *See Dow Chem. Co.*, 46 S.W.3d at 241. The trial court below heard Alfred and Bellard testify that the RV Park was not part of Ford Park. The trial court also heard Branick's testimony that he was the County's contractual liaison with Ford Park's management company, that the RV Park in no way contributed to the public purposes of the operation of Ford Park, the RV Park played no part in the operation

of Ford Park or the softball or baseball diamonds, and the operations, duties, and employees of the RV Park did not overlap with those of Ford Park. The trial court also heard Branick testify that, although the original vision for the RV Park was to promote Ford Park, the RV Park in no way contributed to the public purposes of Ford Park, and it was his understanding that most of the RV Park's spaces were occupied by people doing construction in the area and not visitors for Ford Park events. The trial court heard Branick and Bellard testify that they did not believe that the RV Park was being operated for a public purpose. While there was contrary testimony presented at trial from McGregor, the trial court as the factfinder could have believed the testimony from Branick and Bellard over McGregor. Considering the evidence and testimony at trial in the light most favorable to the finding under review, as we must, we conclude that the evidence is sufficient to support a conclusion by the trial court that I-10 R.V. did not show that the exemption applies, and the trial court could have reasonably concluded that the RV Park is not used for public purposes. *See City of Keller*, 168 S.W.3d at 822.[7] As a result, we overrule Appellant's second issue. Because issue two is dispositive, we need not address issue

---

[7] On appeal, the County argues the trial court's determination of the market value of the property for tax year 2017 at $1,288,680 should be affirmed because no contrary evidence of value was presented. I-10 R.V. does not challenge the market value of $1,288,680 on appeal. We note that the total assessment of $1,288,680 included both "a Structured/Improvement Market Value" and a "proposed Market Value of Non-Ag Timber Land." We expressly limit our holding here to the facts and the issues raised on appeal before us in this appeal.

one. *See Gables Realty*, 81 S.W.3d at 874 (section 25.07 only becomes operative if the property is tax-exempt under section 11.11); *see also* Tex. R. App. P. 47.1. We affirm the trial court's judgment.

      AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on November 30, 2021
Opinion Delivered April 21, 2022

Before Golemon, C.J., Horton and Johnson, JJ.